RECOMMENDED FOR PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)
File Name: 25a0278p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

─────────────

JESSICA CLIPPINGER, nka Jessica Pyron, on behalf of
herself and all others similarly situated,

*Plaintiff-Appellee,*

*v.*

STATE FARM AUTOMOBILE INSURANCE COMPANY,

*Defendant-Appellant.*

┐
│
│
│
│
├  No. 24-5421
│
│
│
│
┘

─────────────

Appeal from the United States District Court for the Western District of Tennessee at Memphis.
No. 2:20-cv-02482—Thomas L. Parker, District Judge.

Argued: May 1, 2025

Decided and Filed: October 9, 2025

Before: MOORE, GIBBONS, and MURPHY, Circuit Judges.

─────────────

## COUNSEL

**ARGUED:** Eric L. Robertson, WHEELER TRIGG O'DONNELL LLP, Denver, Colorado, for
Appellant. Lee Lowther, CARNEY BATES & PULLIAM, PLLC, Little Rock, Arkansas, for
Appellee. **ON BRIEF:** Eric L. Robertson, Daniel N. Nightingale, WHEELER TRIGG
O'DONNELL LLP, Denver, Colorado, Peter W. Herzog III, WHEELER TRIGG O'DONNELL
LLP, St. Louis, Missouri, Christopher L. Vescovo, LEWIS THOMASON, Memphis, Tennessee,
for Appellant. Lee Lowther, Hank Bates, CARNEY BATES & PULLIAM, PLLC, Little Rock,
Arkansas, Jacob L. Phillips, JACOBSON PHILLIPS PLLC, Altamonte Springs, Florida, for
Appellee. Adam G. Unikowsky, JENNER & BLOCK LLP, Washington, D.C., for Amici
Curiae.

GIBBONS, J., delivered the opinion of the court in which MOORE, J., concurred.
MURPHY, J. (pp. 26–42), delivered a separate dissenting opinion.

---

**OPINION**

---

JULIA SMITH GIBBONS, Circuit Judge.  In this case, the district court certified a class of Tennesseans insured by State Farm Mutual Automobile Insurance Company ("State Farm") who, after their cars were totaled, received a payout from State Farm that was calculated utilizing car valuation data generated by another company, Audatex.  Named plaintiff-appellee Jessica Clippinger[1] argues that the use of a particular cost adjustment as part of this methodology impermissibly reduced those valuations in breach of contract and Tennessee law.  The district court certified a class made up of State Farm-insured Tennessee plaintiffs who received an "actual cash value" payout for the total loss of a car, where the payout was calculated by that methodology and decreased by application of the challenged adjustment.  State Farm appealed class certification, and we granted review.  We now affirm the district court's certification of the class and remand for further proceedings.

I.

After some car accidents, the cost of repairing a damaged car exceeds the car's value.  Such a car is deemed a total loss (i.e., totaled), meaning that the insurer will pay for the value of the car as it was before the crash instead of paying the cost of fixing it.  Tennessee resident Jessica Clippinger's 2017 Dodge minivan, covered by a State Farm policy, was totaled in May of 2019.  Using Audatex's Autosource product, State Farm calculated a valuation for her car of $14,490.00 excluding taxes and fees.  Because Clippinger's class action suit challenges the methodology by which State Farm reaches these valuations for its insured customers, we begin by setting out the process as it applies to the certified class.

State Farm's standard Tennessee auto insurance policies provide that when a car is totaled, the insurance company will pay the insured the "actual cash value of the covered vehicle."  DE 146-2, Policy, Page ID 4018.  The term "actual cash value" is also covered by a

---

[1]Clippinger has married and goes by Jessica Pyron now.  State Farm refers to her as Clippinger.  For consistency with earlier opinions in this case, we also refer to her as Clippinger.

Tennessee state regulation, which offers guidance as to how such a value may be calculated.**2** By the terms of the policies, State Farm and the owner of the vehicle must agree on a figure; in Clippinger's case, State Farm calculated a figure of $14,490 and offered it to her as actual cash value. The policy further provides that "if there is disagreement as to the actual cash value of the covered vehicle" after this offer is made, "the disagreement will be resolved by appraisal upon written request of the owner or [State Farm]." DE 146-2, Policy, Page ID 4018. Appraisal occurs as follows: each party names an appraiser, and then the two appraisers select a third; if they cannot agree on a third appraiser within 30 days, then either party can request a court with jurisdiction to appoint the third appraiser. An appraisal that is agreed on and signed by any two appraisers is binding on State Farm and the owner of the covered vehicle. Each party bears the cost of its own appraiser and any other cost it incurs, but the parties split the cost of the third appraiser.

The dispute in this case concerns the payouts State Farm makes for totaled cars and how they are calculated. State Farm works with the company Audatex, whom Clippinger also sued (but who is not a party to this appeal).**3** During the time relevant to this case, upon a request from State Farm, Audatex would find comparable cars—broadly, cars of the same model, year, and style as the totaled car—within its database. Audatex then determined the selling price or the advertised price of these cars in the 120 day range around the date the car was totaled.

---

**2**Specifically, the regulation provides that one of a few broad methods must be used "at the discretion of the insurer." Tenn. Comp. R. & Regs. 0780-01-05-.09 (1) (2017). The insurer may "offer a replacement automobile" or "elect a cash settlement based upon the actual cost, less any deductible provided in the policy, to purchase a comparable automobile[.]" *Id.* (1)(a) & (b). Any source used to determine the fair market value of an automobile must (i) give "primary consideration" to the value of the cars in the local market area, but "may consider data" on vehicles outside the area; (ii) the "source's database" must "produce values for at least eighty-five percent [] of all makes and models for the last fifteen [] model years, taking into account the values of all major options for such vehicles;" and (iii) the source must "produce fair market values based on current data available" in the area where the vehicle was primarily garaged. *Id.* (1)(b)(4)(i)–(iii). If any deviation from these methods is used, the deviation must be supported by automobile-condition-specific documentation. *Id.* 1(c).

In Tennessee, applicable statutes are incorporated into insurance policies. *See Martin v. Powers*, 505 S.W.3d 512, 517–18 (Tenn. 2016); *Kogan v. Tenn. Bd. of Dentistry*, No. M2003-00291, 2003 WL 23093863, at *5 (Tenn. Ct. App. Dec. 30, 2003) (regulations issued pursuant to statute have the force of law); *Costello v. Mountain Laurel Assurance Co.*, 670 F.Supp.3d 603, 615–16 (E.D. Tenn. 2023) (citing *Martin*, *Kogan*, and the district court in this case).

**3**The district court denied without prejudice the motion to certify a class against Audatex, noting that the parties spent most of their time on the State Farm breach of contract claims.

Then the calculation took an additional step which is challenged by the plaintiffs here:  the application of a Typical Negotiation Adjustment ("TNA") to the prices of those comparable cars.  The adjusted prices of these comparable cars would then be factored into the actual cash value figure.

The purpose of the TNA, according to State Farm, is to account for a difference between advertised price and fair market value, because buyers and sellers of used cars at dealerships typically negotiate a lower price than that at which the car was listed.  Clippinger's claims, however, assert that the negotiation adjustment is unfair and improper because it does not reflect typical practices or the reality of the market.  Instead, in her telling, the modern used car market involves online shopping and price comparison, and used cars much more often sell for their advertised price.  So, she claims, the TNA artificially decreases the actual cash value figure.  And putative class members who received a payout based on an Audatex valuation with a TNA applied suffered a breach of contract, because the actual cash value figure for their totaled car was reduced by application of a bogus adjustment.

In May of 2020, Clippinger sued State Farm in Tennessee state court on behalf of herself and all others similarly situated, alleging that the valuation was in violation of Tennessee law and a breach of contract.  After Clippinger filed an Amended Class Action Complaint on June 3, State Farm removed the case to federal court under the removal provision of the Class Action Fairness Act, 28 U.S.C. § 1453.  The district court denied an initial State Farm motion for summary judgment but granted its motions for appraisal and a stay pending appraisal, holding that the appraisal provision in the policies was valid and enforceable, though not a condition precedent to suit.

The parties then proceeded through the appraisal process.  Each party chose an appraiser, and a third appraiser was chosen by the district court.  Megan O'Rourke, chosen by State Farm, valued Clippinger's car at $14,432.00.  Roy Bent, chosen by Clippinger, valued it at $17,756.69.  And Ross Chandler, chosen by the court, valued it at $18,476.13.  Bent eventually signed an appraisal alongside Chandler valuing the car at $18,476.00.  So, as required by the policy, State Farm paid the difference between its initial valuation and that figure to Clippinger.

State Farm moved for summary judgment.  It argued that Clippinger's breach of contract claim stemming from the alleged underpayment in the initial valuation had been resolved by the payment following appraisal, and thus her action could no longer be maintained.  The district court denied summary judgment for State Farm, reasoning that Clippinger's claims for breach of contract survived.  Even though Clippinger's initial claim sought the $913.64 TNA amount that had been applied to the first valuation of her car, and State Farm had subsequently paid $4,265.16 after appraisal, Clippinger's claims went beyond the difference in actual cash value by alleging that State Farm had "knowingly and without explanation reduced the cash value" for Clippinger's car in a way that "left [her], and other Tennessee insureds, with a choice either to accept less than the actual cash value for her vehicle or spend the money required to invoke the appraisal provision."  DE 126, Order Denying Second Mot. for Summ. J., Page ID 2447.

Clippinger then moved to certify a class of Tennesseans who had suffered the same alleged breach of contract injury by State Farm.  In so doing, Clippinger claimed that damages could be calculated for any class member by running the Audatex process while removing the TNAs from the calculations.  And Clippinger sought her appraisal costs as consequential damages of the alleged breach.

The district court granted the motion to certify the class in part.  The certified class is as follows:

> All persons who made a first-party claim on a policy of insurance issued by State Farm Mutual Automobile Insurance Company to a Tennessee resident who, from May 8, 2019, through the date an order granting class certification is entered, received compensation for the total loss of a covered vehicle, where that compensation was based on an appraisal report prepared by Audatex and the actual cash value was decreased based upon typical negotiation adjustments ("TNA") to the comparable vehicles used to determine actual cash value.

DE 202, Order on Class Cert., Page ID 6949 (footnote omitted).  State Farm petitioned for review of the order certifying the class.  *See* Fed. R. Civ. P. 23(f).  This court granted the petition in April 2024, and this appeal followed.

II.

We review a district court's certification of a class for an abuse of discretion. *Hicks v. State Farm Fire & Cas. Co.*, 965 F.3d 452, 457 (6th Cir. 2020).  A district court abuses its discretion if it "relies on clearly erroneous facts, misapprehends the law, or makes a 'clear error of judgment.'" *In re Nissan N. Am. Inc., Litig.*, 122 F.4th 239, 245 (6th Cir. 2024) (internal quotation omitted).  The district court's review must be "rigorous[,]" and it may need to "probe behind the pleadings before coming to rest on the certification question." *Comcast Corp. v. Behrend*, 569 U.S. 27, 33 (2013) (quoting *Gen. Tel. Co. of Sw. v. Falcon*, 457 U.S. 147, 160–61 (1982)).  Sometimes this review will "overlap with the merits of the plaintiff's underlying claim," but it is not a "license to engage in free-ranging merits inquiries at the certification stage." *Zehentbauer Fam. Land, LP v. Chesapeake Expl., L.L.C.*, 935 F.3d 496, 504 (6th Cir. 2019) (quoting *Comcast*, 569 U.S. at 33–34, and *Amgen Inc. v. Conn. Ret. Plans & Tr. Funds*, 568 U.S. 455, 466 (2013)).

III.

This class action is brought under Federal Rule of Civil Procedure 23(b)(3).  Thus, the class must satisfy the four requirements of Rule 23(a) (numerosity, commonality, typicality, and adequacy), as well as the two additional requirements of 23(b)(3) (predominance and superiority), and the Rule's implied requirement of ascertainability.  We conclude that the class has satisfied all seven prerequisites.

A.

1.

We begin with the question of standing.  Article III of the Constitution allows federal courts to decide only "Cases" and "Controversies."  U.S. Const. Art. III, § 2.  To have standing to sue under Article III, a plaintiff must show that she has "suffered an injury," that she can "trace this injury to the defendant," and "that a court can redress it." *Fox v. Saginaw Cnty.*, 67 F.4th 284, 293 (6th Cir. 2023) (citing *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992)).  State Farm argues that this class cannot be certified because members lack standing under the

Supreme Court's decision in *TransUnion LLC v. Ramirez*, 594 U.S. 413 (2021).  We disagree and hold that because Clippinger claims damages flowing from an alleged breach of contract, she has standing, and that *TransUnion* is no barrier to class certification in this case.

While *TransUnion* constricts the sorts of injuries for which Congress can allow plaintiffs to sue and made clear that ultimate recovery of class members depends on their standing, it did not confront a breach of contract claim.  The relevant holding in *TransUnion* was that portions of the class at stake in that case, although they had suffered a statutory harm and possessed a statutory right of action, did not possess Article III standing to sue because they had not suffered a concrete and particularized injury.  *Id.* at 417, 442.  But, as we have recently noted, the Supreme Court "expressly declined to address" whether the entire class had to demonstrate standing before certification, "suggesting that a wider array of injuries may initially qualify." *Pickett v. City of Cleveland*, 140 F.4th 300, 312 (6th Cir. 2025).  The Supreme Court instead "offer[ed] virtually no guidance on standing at the class certification stage and disclaim[ed] the intent to do so." *Id.*

State Farm's argument against standing is that a purported breach which does not ultimately lead to damages cannot be a breach in the first place—and thus no injury has occurred.  This argument is a theory of the contracts at issue in the case, and an argument that goes to the ultimate merits.  But, properly considered, it is not a standing argument. *See Hicks*, 965 F.3d at 463.  A plaintiff can still establish standing by alleging a breach of contract (and therefore a concrete injury). *Id.*  If, during litigation, it is determined that no breach occurred, she loses on the merits, but her case is not dismissed for lack of standing. *Id.*  Put differently, when a defendant in a contract case argues that there was no breach of the contract, that argument is not an argument that the plaintiff lacks standing to sue in federal court. *Hicks* remains fully valid after *TransUnion*.

This conclusion aligns with broader principles.  For instance, Article III courts have an independent obligation to verify their own subject matter jurisdiction, which includes making sure plaintiffs have standing. *CHKRS, LLC v. City of Dublin*, 984 F.3d 483, 489–90 (6th Cir. 2021).  If standing depended on the merits of a breach of contract argument, we would need to evaluate every potential argument for breach, even those not briefed, to ensure the case belonged

in federal court.  *Id.*  (citation omitted); *Springer v. Cleveland Clinic Emp. Health Plan Total Care*, 900 F.3d 284, 287–90 (6th Cir. 2018)).  In other words, a plaintiff could proceed only after the court independently assessed and rejected any potential defenses to a breach argument, even those not raised by the defendant.  *Id.*  Such an analysis is not required.  *TransUnion* does not necessitate sua sponte dismissal of all meritless breach of contract claims for lack of standing.

Although the circuits have divided on this point since *TransUnion*, we are convinced by the caselaw supporting the proposition that, even without a claim of damages, breach of contract is a concrete injury in fact for standing purposes.  *See Attias v. CareFirst, Inc.*, 346 F.R.D. 1, 9 (D.D.C. Mar. 29, 2024) (collecting cases on both sides of the issue), *motion to certify appeal denied*, No. 15-CV-882 (CRC), 2024 WL 3886643 (D.D.C. Aug. 20, 2024), and *leave to appeal denied sub nom. In re Attias*, No. 24-8001, 2024 WL 4633243 (D.C. Cir. Oct. 29, 2024) (collecting cases on both sides of the issue); *see also Glennborough Homeowners Ass'n v. U.S. Postal Serv.*, 21 F.4th 410, 415 (6th Cir. 2021) (noting that "a breach of a contract between two private parties, standing alone, may suffice as an injury for purposes of constitutional standing" but declining to conclusively decide the question).  Ultimately, we hold that private rights created by valid contracts between private parties are the kind of rights that have traditionally been cognizable in American courts.  *Cf. TransUnion*, 594 U.S. at 424–26, 432–33; *see also Springer*, 900 F.3d at 287–88; *id.* at 290–93 (Thapar, J., concurring).[4]

2.

We also decide another issue here.  These arguments, as to Clippinger and as to any class member who later undergoes appraisal, could more appropriately raise mootness concerns, not

---

[4]State Farm points to *Thole v. U.S. Bank N.A.*, 590 U.S. 538 (2020), which interpreted ERISA's duties of loyalty and prudence, and *Dinerstein v. Google, LLC*, 73 F.4th 502, 518–20 (7th Cir. 2023), which reasoned from *TransUnion* and *Thole* to hold that breach of contract is merely an injury in law that cannot confer standing alone. We disagree with State Farm and agree with the analysis of the district court in *Attias* on this point.  346 F.R.D. at 10.  *Thole* is narrower than State Farm and the Seventh Circuit in *Dinerstein* believe.  *See Dinerstein*, 73 F.4th at 520.  Although the *Thole* majority briefly analogized ERISA-created rights to contract rights, that case simply did not speak to the nature of a purely private breach of contract claim like this one.  *See* 590 U.S. at 548 (Thomas, J., concurring) ("[T]he private rights that were allegedly violated do not belong to petitioners under ERISA or any contract.").  In *Thole*, the alleged injury was a breach of ERISA fiduciary duties, not a breach of contract; the plaintiffs had received everything to which they were contractually entitled.  *Id.* at 542.  *Dinerstein*, in turn, begs the question by stating that "*Spokeo* and *TransUnion* put an end to federal courts hearing claims based on *nonexistent* injuries—regardless of historical pedigree." 73 F.4th at 521.

standing concerns.  And at least as to Clippinger, they would fail under that analysis.  "[I]f a plaintiff possesses standing from the start, later factual changes cannot deprive the plaintiff of standing.  Those changes instead will create 'mootness' issues and trigger that doctrine's more forgiving rules."  *Fox*, 67 F.4th at 295 (internal citations omitted).  Appraisal was invoked only after Clippinger filed suit.  To the extent State Farm argues that Clippinger lacks standing only *after* appraisal, its argument is based on mootness and not standing.  *See id.*

But State Farm does not make a mootness argument and likely would not prevail if it had. Courts, including this one, have applied a "picking off" exception to the mootness doctrine in the class action context.  *See Wilson v. Gordon*, 822 F.3d 934, 951 (6th Cir. 2016).  That doctrine is aimed at preventing "strategic" conduct by a putative class defendant who seeks to satisfy only a named plaintiff and thus avoid a class action.  *Id.* at 947; *see generally* William B. Rubenstein, *Newberg & Rubenstein on Class Actions* § 2:15 (6th ed. 2024).  It is well established that an unaccepted offer of judgment under Fed. R. Civ. P. 68 to resolve a named plaintiff's claim does not moot a class action.  *Campbell-Ewald v. Gomez*, 577 U.S. 153, 165–66 (2016).  Shortly after *Campbell-Ewald*, we expressed our belief that the "picking off" doctrine would apply even to an *accepted* voluntary settlement agreement if its application were justified by "the *defendant's* behavior to avoid a class action."  *Wilson*, 822 F.3d at 951 n.5 (emphasis in original).  And other courts have approached "voluntary action" of this kind by class defendants, if they "perceive the defendant as strategically attempting to insulate the issue from judicial review," similarly to cases under Rule 68.  Newberg & Rubenstein, § 2:15 & nn.39–41 (collecting cases).  Therefore, even if Clippinger were not still seeking further damages, we do not believe that undergoing a mandatory appraisal process, invoked by the defendant after she sued, would moot her claim.

B.

Because Clippinger, the named plaintiff, still has standing, and *TransUnion* does not preclude certification on standing grounds, we now move to the requirements of Rule 23(a): numerosity, commonality, typicality, and adequacy.  These requirements must be satisfied for any class action to proceed.

Tennessee substantive law applies to the claims at issue in this case, which was brought in Tennessee state court and removed pursuant to 28 U.S.C. §§ 1332, 1441, and 1453. *Biegas v. Quickway Carriers, Inc.*, 573 F.3d 365, 374 (6th Cir. 2009). The parties do not dispute this.

State Farm does not expressly challenge on appeal the district court's conclusions on numerosity or commonality, focusing its arguments on typicality, adequacy, predominance, and superiority. Because it is still Clippinger's burden to show that these requirements are met, we first briefly review the district court's decision as to numerosity and commonality.

1.

Rule 23(a)(1) requires that a class be "so numerous that joinder of all members is impracticable." Fed. R. Civ. P. 23(a)(1). With the benefit of discovery, Clippinger asserted that the class included over 90,000 members. This number is certainly large enough to support a finding of numerosity. *See In re Whirlpool Corp. Front-Loading Washer Prods. Liab. Litig.*, 722 F.3d 838, 852–53 (6th Cir. 2013).

2.

Rule 23(a)(2) requires that there be "questions of law or fact common to the class." Fed. R. Civ. P. 23(a)(2). This means that a party seeking certification "at a minimum must show that the action will 'resolve an issue that is central to the validity of each one of the claims.'" *In re Nissan N.A., Inc. Litig.*, 122 F.4th 239, 248 (6th Cir. 2024) (quoting *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350 (2011)). The district court analyzed commonality along with predominance and found that both were satisfied.

Such an analysis accords well with this court's Rule 23's commonality standard. *Speerly v. Gen. Motors, LLC*, 143 F.4th 306, 316–18 (6th Cir. 2025) (en banc). Under that standard, we first require that the district court "check to see that the plaintiffs have identified a 'common question of law or fact'" that will "(1) yield a common answer with common evidence and (2) meaningfully progress the lawsuit." *Id.* at 316 (quoting Fed R. Civ. P. 23(a)(2)). If the question might be answered differently for different members of the class based on the common evidence, it is not common. *Id.*

The district court abided by our requirements when it, first, found that the inquiry of whether State Farm's calculation methodology with the TNA applied resulted in "an artificially reduced amount" rather than actual cash value "as contractually required" was the "central question" susceptible to classwide proof. DE 202, Order on Class Cert., Page ID 6940 (internal citations omitted). And second, the district court rightfully noted the disposition of this legal question would depend on classwide factual questions, such as whether the TNA was a fair reflection of market conditions. *Id.*

But commonality also asks for a bit more. A district court carrying out a commonality analysis must also connect the central question to an "element" of the plaintiff's claim. *Speerly*, 143 F.4th at 316 (quoting *Nissan*, 122 F.4th at 246–47). This is to "ensure" that the question is sufficiently "central to the validity" of the claim at issue. *Id.* at 317 (quoting *Wal-Mart*, 564 U.S. at 350). At the same time, such a connection does not require a "rote explication"; instead, "[t]he plaintiffs must tie that debated question to 'the relevant elements' of that claim." *Id.* at 319 (quoting *id.* at 367 (Moore, J., dissenting) and *Nissan*, 122 F.4th at 246–47). Clippinger and the district court have done that. The central legal question here was whether the application of the TNA "means" that "Defendants are not calculating ACV as contractually required but are, instead, calculating an artificially reduced amount." DE 202, Order on Class Cert., Page ID 6940 (quoting DE 138, Sealed Mot. for Class Cert., Page ID 2517). And the plaintiffs had claimed in their motion for class certification that the "breach element" of their breach of contract claim was subject to common proof about the statistical basis for the TNA and underlying Audatex valuation method. DE 138, Sealed Mot. for Class Cert., Page ID 2516–17.

3.

Rule 23(a)(3) requires that the named plaintiff's claims be typical of the class "so that, by pursuing their own interests, the class representatives also advocate the interests of the class members." *Whirlpool*, 722 F.3d at 852–53. State Farm argues that Clippinger's claims are not typical of the class because, after undergoing appraisal, her individual case is no longer affected by any erroneous initial valuation. We disagree. Her claims still depend on the same question of liability as those of the rest of the class. In answering State Farm's argument against typicality based on appraisal, the district court correctly relied on *Hicks*. In that case, State Farm had

applied a challenged labor depreciation adjustment to homeowner insurance payouts. 965 F.3d. at 455. After a previous Sixth Circuit decision had established that that adjustment was not proper under Kentucky law, State Farm created a payback program to reimburse some customers who had had the adjustment applied to their payouts. *Id.* at 456. As a part of this program, State Farm recalculated payouts using its original methodology without the challenged adjustment and sent the difference in value to its policyholders. *Id.* at 457. The district court in *Hicks* certified a class that included anyone who had received a payout with the challenged adjustment—even some who had already "been reimbursed for previously withheld labor depreciation costs." *Id.* at 457, 461.

State Farm made several arguments against certification in *Hicks*, including that State Farm "should have an opportunity to prove individualized defenses" and that "putative class members who, like Hicks, have completed their repairs and received RCV payments with recovered depreciation have suffered no injury and lack standing." *Id.* at 462–63. We rejected both arguments and held that the district court did not abuse its discretion in certifying the class. *Id.* *Hicks* supports the conclusion that liability and damages issues can be separated in an insurance payout adjustment case. *Id.* at 460; *see also Whirlpool*, 722 F.3d at 861; *Pickett*, 140 F.4th at 310 ("The fact that some members of the Water Lien Class may not be eligible for damages, or may receive damages in varying amounts, does not invalidate the district court's certification of the class based on a common question.") (citing *Hicks*, 965 F.3d at 460). Despite the ostensible repayment pursuant to appraisal (which for State Farm, ends her case), Clippinger relies on the same breach of contract in support of her remaining claim for consequential damages—she is still seeking to argue on behalf of the class that the TNA is unfair and improper on the same basis for her as it is for everyone else. *Hicks* controls the case before us, and Clippinger's breach and liability arguments are still typical of the class.

State Farm has an alternative theory of the case based on a more limited understanding of what it owed under the contracts at issue. To State Farm, Clippinger is not typical—and in fact is outside the class—because she (1) underwent appraisal; (2) as a result received more money than the amount by which, by application of the TNA, her initial valuation was reduced; and (3) no longer disputes that she has received the actual cash value of her car.

We disagree and conclude that Clippinger is still a member of the class because she is still seeking a finding of liability for the same alleged breach as the rest of the class. This is true both because of our application of the "picking off" doctrine, *see* III.A, *supra*, and because the same theory of liability underlies both her claims seeking further damages beyond just the TNA value and the class's claims for damages in the amount of the TNA value. Just as she would have done before appraisal, Clippinger seeks to present evidence to the jury that would attempt to show that the calculation and application of the TNA was a breach of contract under Tennessee law. And even after appraisal, she argues that her claimed damages still flow from the same injury as that alleged to have been suffered by other putative class members.

These further damages (for example, her arguments seeking appraisal costs as foreseeable consequential damages of the TNA breach, and as damages for breach of the implied covenant of good faith and fair dealing), might not be identical among all the class members—some, like Clippinger, may have undergone or may undergo appraisal—but they stem from an identical theory of liability. As such, the question of the accuracy, fairness, and applicability of the challenged adjustments is still critically relevant to Clippinger's claims, even though she has undergone appraisal since she brought them. And thus Clippinger is still typical of the class.

4.

The district court did not abuse its discretion in holding that Clippinger is an adequate class representative under Rule 23(a)(4). This court considers two adequacy prongs under Rule 23(a)(4): first, "common interests with unnamed members of the class" must be found, and second "it must appear that the representatives will vigorously prosecute the interests of the class through qualified counsel." *Young v. Nationwide Mut. Ins. Co.*, 693 F.3d 532, 543 (6th Cir. 2012) (quoting *In re Am. Med. Sys., Inc.*, 75 F.3d 1069, 1083 (6th Cir. 1996)). Because parties have incentives to litigate their own claims, adequacy generally overlaps with typicality. *Am. Med Sys.*, 75 F.3d at 1083; *see also Falcon*, 457 U.S. at 157 n.13. As previously discussed, Clippinger remains a member of the class. Therefore, the first adequacy prong was met. The second prong was then met by the experience of Clippinger's counsel. In Clippinger's case adequacy rises and falls with typicality. Clippinger's claimed damages still flow from an alleged

breach of contract, the same breach of contract as the other class members assert, so she retains the incentive to argue that the initial valuation established liability.

In sum, Clippinger is seeking to show that she has suffered a breach of contract identical to that suffered by the other members of the proposed class.

C.

We now turn to Rule 23(b).  "In addition to satisfying Rule 23(a)'s prerequisites, parties seeking class certification must show that the action is maintainable under Rule 23(b)(1), (2), or (3)." *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 614 (1997).  Because Clippinger sought to certify an opt-out, money damages class action under Rule 23(b)(3), she must satisfy that rule's two additional requirements of predominance and superiority.  *Id.* at 615; Fed. R. Civ. P. 23(b)(3).

1.

We first address the district court's reasoning on the predominance prong of Rule 23(b)(3) and conclude that the district court did not abuse its discretion in finding that "questions of law or fact common to class members predominate over any questions affecting only individual members."  Fed. R. Civ. P. 23(b)(3).  Put briefly, commonality requires common issues among the class, while predominance requires that these common issues predominate over issues that may affect different class members differently.  "[W]hile the commonality element of Rule 23(a)(2) requires showing one question of law or fact common to the class, a Rule 23(b)(3) class must show that common questions will *predominate* over individual ones."  *Young*, 693 F.3d at 543–44.

In a properly certified 23(b)(3) class, "[c]ommon questions subject to classwide proof must predominate over individualized questions, prompting us to ask whether the proposed class action beats the conventional approach of resolving disputes on a case-by-case basis in terms of efficiency and administrability."  *Tarrify Props., LLC v. Cuyahoga County*, 37 F.4th 1101, 1106 (6th Cir. 2022) (citing *Wal-Mart Stores Inc.*, 564 U.S. at 348–57).  The district court found that the inquiry of "whether the TNA accurately reflects how cars are valued and sold in the market"

and relatedly, whether the value calculation with the TNA applied resulted in "an artificially reduced amount" rather than actual cash value, was the "central question" susceptible to classwide proof. DE 202, Order on Class Cert., Page ID 6940 (internal citations omitted). Accordingly, the district court approved a class damages model which removed the TNA from the Audatex valuations, because it found that "State Farm 'cannot dispute that applying every aspect of its valuation process other than the [TNA] leads to an accurate valuation, at least in situations where application of a [TNA] is inappropriate.'" *Id.* at Page ID 6941 (internal quotation omitted). This liability question is common to a class made up of Tennessee insureds who received a TNA-impacted actual cash value payout from State Farm.

It is true that Clippinger's own damages—and ultimate damages among the class members—may differ because of a reference, or lack of reference, to appraisal costs. However, we agree with the district court that such individualized damage inquires *do not* defeat predominance because they flow from the same theory of liability. *Id.* at Page ID 6944–46. This accords with our decision in *Hicks*, where we held that a similar challenged insurance payout adjustment presented a common legal issue that predominated over individual issues, even where damages could vary from person to person. *See* 965 F.3d at 459–60. In this case, State Farm argues that the level of damages creates individualized merits questions for the class such that individual issues will predominate. Such an argument was raised in *Hicks* and was rejected. 965 F.3d at 462–63.

It is also true that in some other circuits, insurance valuation class certifications have been defeated because of differing damage calculations undermining Rule 23(b)(3) predominance. In particular, State Farm points us to the Ninth Circuit case of *Lara v. First National Insurance Company of America*, 25 F.4th 1134 (9th Cir. 2022) which has influenced the Third, Fourth, Fifth, and Seventh Circuits. *Lewis v. Gov't Emps. Ins. Co.*, 98 F.4th 452 (3d Cir. 2024); *Freeman v. Progressive Direct Ins. Co.*, 149 F.4th 461 (4th Cir. 2025); *Sampson v. United Servs. Auto. Assoc.*, 83 F.4th 414 (5th Cir. 2023); *Schroeder v. Progressive Paloverde Ins. Co.*, 146 F.4th 567 (7th Cir. 2025). We are not convinced by the holdings of those of our sister circuits that follow *Lara* to its fullest. Rather, we adhere to our methodology and reasoning in *Hicks*, and are more persuaded by the Ninth Circuit's post-*Lara* decision in *Jama v.*

*State Farm Mutual Automobile Insurance Co.*, 113 F.4th 924 (9th Cir. 2024), *cert. denied*, 2025 WL 1678989 (June 16, 2025).

In *Lara*, the Ninth Circuit affirmed a district court's refusal to certify a similar class on predominance grounds. 25 F.4th at 1140. *Lara* concerned a class of customers insured by Liberty Mutual in Washington state who argued that Liberty Mutual was breaching its insurance contracts with them, and breaching Washington trade practices law, when it applied a "condition adjustment" to the calculated valuation of totaled cars and did not itemize or explain the deduction, as required by state regulations.[5] *Id.* at 1137. Like State Farm's contracts, the policies at stake in *Lara* concerned the actual cash value of totaled cars and provided for binding appraisal if the customer rejected the offer. *Id.* at 1136–37.

The Ninth Circuit held that the district court did not abuse its discretion in finding that classwide issues did not predominate. *Id.* at 1138–40. Although the question of the condition adjustment's compliance with Washington state law was a common question, breach of contract and unfair trade practice claims required proof of an injury, and showing "an injury will require an individualized determination for each plaintiff." *Id.* at 1138. As the Ninth Circuit held, "[b]ecause Liberty only owed each putative class member the actual cash value of his or her car, if a putative class member was given that amount or more, then he or she cannot win on the merits." *Id.* at 1139. It was a problem that the putative class could have included people for whom an adjuster gave a valuation higher than that provided by the CCC report or who went through appraisal: if those people ended up receiving more than the actual cash value of their car, they would not be able to recover. *Id.* This would require an individualized determination. For the Ninth Circuit, even where Liberty Mutual "used CCC's estimate without making any further adjustments," the district court would still "have to look into the actual value of the car, to see if

---

[5]The "condition adjustment" in *Lara*, like State Farm's comparison valuation method, was calculated with reference to similar make and model cars at dealerships in the area. 25 F.4th at 1136. The idea behind this adjustment in *Lara* was that the average used car for sale at a dealership is in better condition than used cars of the same make and model in the possession of customers. *Id.* at 1136–37. The adjustment tried to quantify this difference, and it factored into the valuation figure generated by CCC, the other defendant in the *Lara* case and a company analogous to Audatex in the case before us. *Id.* CCC would "also look[] at the actual pre-accident condition of the totaled car" and, if the car had been in good condition, would "reverse[] the negative adjustment and sometimes even appl[y] a positive adjustment." *Id.* at 1137. That valuation figure from CCC would then go to a Liberty Mutual adjuster, who would make an offer that was "usually but not always" based on the report. *Id.*

there was an injury." *Id.* And even if a potential procedural violation of Washington law was necessarily a breach, plaintiffs still needed to show injury. *Id.* Thus, for the *Lara* court, everything depended on whether plaintiffs and class members ultimately received less than actual cash value regardless of any potential violation before that point, and this defeated predominance. *Id.*

For four reasons, we see the issues differently from the Ninth Circuit's reasoning in *Lara* and from the circuits that have followed *Lara*'s approach. First, we consider these individualized issues to be *damages* issues and not *merits* issues. On appeal, State Farm devotes a great deal of briefing to the argument that individualized damages issues would predominate. But as to this class, *even if damages will have to be tried separately*, a common answer on whether the TNA is a breach of contract can be generated through common proof and takes center stage in this case. *See Hicks*, 965 F.3d at 460; *Pickett*, 140 F.4th at 310–11. We have approved a class certification even where separate legal *defenses* might apply to some but not all class members, noting that "a possible defense, standing alone, does not automatically defeat predominance" even where it might not apply to all class members. *Bridging Cmtys., Inc. v. Top Flite Fin. Inc.*, 843 F.3d 1119, 1125–26 (6th Cir. 2016) (citations omitted). If a potential defense, available only to some class members, does not necessarily defeat predominance, neither should potentially differing damages.

Second, there are crucial factual difference between plaintiffs' theories of the case in *Lara* and here. In *Lara*, the plaintiffs argued that Liberty Mutual had failed to "itemize[e] or explain[]" the challenged adjustment. 25 F.4th at 1137. However, Clippinger and the class mount a direct, substantive challenge by arguing that the TNA is always negative and thus always results in an improperly reduced valuation for their cars. Rather than asking State Farm merely to show its work, they claim their valuations were too low because the TNA was applied. And this fact brings up another distinction: in *Lara*, CCC would sometimes (before the valuation was finalized or any money was paid) lessen or even reverse the challenged "condition" adjustment depending on the pre-accident condition of the totaled car. 25 F.4th at 1137. In other words, the challenged condition adjustment itself was tweaked, before any money was paid or offer was made, based on individualized assessments of the car's condition. *Id.* Here, the class

definition includes only those whose "actual cash value was decreased based upon typical negotiation adjustments ("TNA") to the comparable vehicles used to determine actual cash value." DE 202, Order on Class Cert., Page ID 6949. State Farm does not argue that any analogous counter-negotiation-adjustment was made for class members. Instead, it argues much more broadly that the valuation process is simply "inherently individualized," which would seem to support a conclusion that the predominance inquiry could *never* be satisfied for any valuation-based class. Such a broad position is foreclosed by our decision in *Hicks*. The definition of the class to include only those for whom the TNA's calculation and application reduced their ACV figures properly focuses the inquiry on those affected by the challenged adjustment.[6]

Third, the Ninth Circuit itself has since arguably narrowed the applicability of *Lara* in *Jama v. State Farm Mutual Automobile Ins. Co.*, 113 F.4th 924 (9th Cir. 2024), *cert. denied*, 2025 WL 1678989 (June 16, 2025). In *Jama*, confronting very similar facts, the district court had (pre-*Lara*) certified a class based on "condition" adjustments as well as "negotiation" adjustments. *Id.* at 926–27. After the *Lara* decision issued, however, the district court decertified both classes, reasoning that *Lara* required the plaintiffs to "demonstrate injury" in a way they had not done. *Id.* 927. On appeal, the Ninth Circuit upheld the decertification of the "condition" class but held that the district court had abused its discretion in decertifying the "negotiation" class. *Id.* The Ninth Circuit held that the negotiation class could prove and measure its injuries on a classwide basis because all claimed they "received less than they were

---

[6]Our approach to this principle similarly distinguishes an additional case to which State Farm and the dissent point us: *Drummond v. Progressive Specialty Ins. Co.*, 142 F.4th 149 (3d Cir. 2025). The *Drummond* court reasoned that the negative impact of a challenged adjustment (very similar to the TNA here) could be negated, and breach of contract claims thus entirely "thwarted," by other steps in the valuation process (i.e. averaging the adjusted amount with another value and making further condition-specific adjustments) such that class members would still receive ACV despite the application of the challenged adjustment. *Id.* at 155–56. Even if *Drummond* were not distinguishable, we respectfully disagree with the argument that the effect of an improper negative adjustment can be washed out by completely unrelated positive adjustments later in the valuation process. This is because those unrelated positive adjustments, if independently justified, should have been applied anyway, so the resulting value is still lower than it should have been. If the TNA always has a negative impact (as it does for each class member here, by definition) and if it is improper (as Clippinger and the class seek to prove to a jury), its inclusion in an otherwise valid process necessarily reduces the final result below the otherwise correct value. *Drummond* hypothesized that there could be class members "who were paid *above* ACV—despite use of [the challenged adjustment]." *Id.* at 157. If the valuation process without the challenged adjustment were accurate, and the adjustment always improper, we do not think there could be. The adjusted result would be lower than ACV.

owed in the exact amount of the impermissible negotiation deduction." *Id.* at 933.[7]  The court noted that "the fact that an insurer's own valuation of an insured's pre-crash vehicle minus one putatively unlawful adjustment may not correctly measure injury for all plaintiffs does not mean that it cannot provide a starting place." *Id.* at 936–37.  In fact, the *Jama* court determined that the district court had been wrong to determine that "the Autosource reports, and the amount of a challenged adjustment" could not be "evidence of value and injury"—even for the "condition" adjustment. *Id.* 936.  The fact that the insurer's own valuation is challenged in this case, too, makes a difference.[8]  And so does the fact that Clippinger alleges violations of Tennessee regulations.[9]  Given this explanation, *Lara* does not categorically bar challenges to insurance valuation adjustment class actions on predominance grounds, even within the Ninth Circuit.[10]

While we recognize that the Ninth Circuit has since narrowed *Jama* itself in *Ambrosio v. Progressive Preferred Ins. Co.*, 2025 WL 2628179 (9th Cir. Sept. 12, 2025), we disagree with *Ambrosio*'s attempt to reconcile *Lara* and *Jama*'s holdings.  In *Ambrosio*, the Ninth Circuit

---

[7]The *Jama* court made the same point we do, in distinguishing *Drummond*, between later positive adjustments related to the challenged adjustment and unrelated positive adjustments.  113 F.4th at 934 n.7 ("While a declaration submitted by State Farm suggests that *condition* adjustments in the initial Autosource report are often subsequently refined for individual insureds, there is no comparable suggestion that any *negotiation* adjustment that is applied is subject to further individualized adjustment.") (emphases in original).

[8]To this point, the Fifth Circuit was "persuaded" by *Lara*'s reasoning in *Sampson v. United Services Automobile Association*.  83 F.4th 414, 422 (5th Cir. 2023).  In that case, the district court had certified a class made up of insured car owners who had received a loss payment based on a particular valuation report from a company like Audatex; the district court had approved a damages model based on the difference between that report and a different valuation methodology—the National Automobile Dealers Association (NADA) guidebook.  *Id.* at 416–17.  The Fifth Circuit decertified, holding that this theory of injury and damages had been "arbitrarily" selected; State Farm had discretion to choose a different valuation method, and the plaintiffs could not establish that they were "entitled" to NADA valuations for their cars.  *Id.* at 417, 420, 422–23.  To the extent it goes beyond *Lara*, *Sampson* can be distinguished by the fact that the class certified here is challenging on its own terms the valuation methodology that State Farm chose, rather than trying to establish that it was entitled to a completely different method.  And, distinct from both *Sampson* and *Lara*, classwide proof, if fully credited, will show that each member of the class was underpaid.  *See Jama*, 113 F.4th at 933 n.5 (distinguishing *Sampson*).

[9]This point distinguishes *Schroeder*, another circuit case to which State Farm and the dissent advert.  146 F.4th at 578–79.  *Schroeder* distinguishes its analysis from that in *Jama*, *Lara*, *Sampson*, *Hicks*, and others on the grounds that the plaintiff in *Schroeder* "relie[d] solely" for her theory of methodological liability on the definition of actual cash value in the policy language.  *Id.*

[10]*Jama* also rejected the same *TransUnion*-based standing argument that we reject on similar grounds, stating that the plaintiffs' claims about the negotiation adjustment raised a "classic pocketbook injury."  113 F.4th at 937 (quoting *Tyler v. Hennepin Cnty.*, 598 U.S. 631, 636 (2023)).  When a plaintiff alleges a breach of contract, and even more clearly when they allege that this breach led to a financial loss, they have alleged a concrete injury for standing purposes.  *See* III.A, *supra*.

affirmed a district court's finding that individual questions predominated where plaintiffs challenged Progressive's use of a "projected sold adjustment" ("PSA"), which, as here, involved a "reduction to the list prices of comparable vehicles to reflect consumer purchasing behavior (negotiating a different price than the listed price)." *Id.* at *2. The court held that "the key factual difference" between *Lara* and *Jama* was that "there [was] nothing facially unlawful about Progressive's use of the PSA." *Id.* at *4. It emphasized that "[w]ithout any evidence that the PSA is disallowed on its face, its mere existence is not common evidence of liability on its own." *Id.* This differed from the negotiation adjustment in *Jama*, which was explicitly prohibited by Washington state law. *Id.* The court therefore held that Progressive's use of the PSA could not serve as common evidence of liability because the insurance policy did not explicitly prohibit it and the "existence of the PSA [did] not necessarily indicate measurable damages, which is required to prove breach of contract in Arizona." *Id.* As a result, the Ninth Circuit found the district court did not abuse its discretion in concluding that individual questions predominated. *Id.* at *5.

In contrast, we read *Jama* and *Lara* to permit class certification "when the challenged adjustment categorically results in all class members receiving less than the actual cash value." *Freeman*, 149 F.4th at 475 (Berner, J., dissenting). Class certification is therefore appropriate, as Clippinger alleges here, where the insurer's application of an artificial adjustment "*necessarily results in a class member receiving less than the [ACV]*." *Id.* (emphasis in original). We do not read *Lara* and *Jama* like *Ambrosio*, which would effectively permit class certification only when the disputed adjustment "is categorically barred by law." *Ambrosio* 2025 WL 2628179, at *4.[11]

Fourth and finally, *Lara* was decided on abuse of discretion review. "[W]hen a matter is entrusted to the district court's discretion[,] '[i]t is possible for two judges, confronted with the identical record, to come to opposite conclusions and *for the appellate court to affirm both*.'" *United States v. Hutchinson*, 573 F.3d 1011, 1030 (10th Cir. 2009) (emphasis in original)

---

[11]As the *Ambrosio* dissent notes, one concern with the majority opinion "is that it has no articulable limit (if any) to what methods are permitted beyond what is provided for in the Contract." *Ambrosio*, 2025 WL 2628179, at *11 (Wallach, J., dissenting). Indeed, under the majority's approach, an insurer could arguably replace the downward adjustment "with an 'Artificial Deduction – a deduction taken without factual basis to pay you less money' in any state that does not foreclose such a deduction by regulation," and still avoid class certification. *Id.*

(quoting *United States v. Williams*, 81 F.3d 1434, 1437 (7th Cir. 1996)). A decision affirming a district court's refusal to certify a class, by itself, does not necessarily suffice to indicate that the district court would have abused its discretion had it certified the class.

Beyond its invocation of *Lara*, *Drummond*, and *Schroeder* on the individualized damages issue, the dissent argues that class treatment abridges State Farm's substantive rights in contravention of the Rules Enabling Act and the Supreme Court's decision in *Wal-Mart*. Dissent at 16 (citing 28 U.S.C. § 2072(b) and *Wal-Mart*, 564 U.S. at 362).[12] To the dissent, class treatment abridges State Farm's right to present statutory defenses. *Id.* at 17; *see also Sampson*, 83 F.4th at 420; *Ambrosio*, 2025 WL 2628179, at \*4. *Wal-Mart*, however, was referring to distinct statutory defenses under Title VII's "detailed remedial scheme" for employment discrimination and the Supreme Court's correspondingly intricate burden-shifting approach. 564 U.S. at 366–67. State Farm's potential defenses, on the other hand, would go to the argument that it could have paid an individual class member actual cash value by calculating differently. Recalling that State Farm can still present individualized valuation evidence in later damages proceedings, we do not believe that applying Rule 23(b)(3) as we do today abridges State Farm's substantive rights in defending its valuation practices. *See Shady Grove Orthopedic Assocs., P.A. v. Allstate Ins. Co.*, 559 U.S. 393, 408 (2010) (plurality op.) (class treatment under Rule 23 "leaves the parties' legal rights and duties intact and the rules of decision unchanged"); *Tyson Foods, Inc. v. Bouaphakeo*, 577 U.S. 442, 453 (2016) (predominance requirement can still be satisfied, "even though other important matters will have to be tried separately, such as damages or some affirmative defenses peculiar to some individual class members") (quoting 7AA C. Wright, A. Miller, & M. Kane, Federal Practice and Procedure § 1778, 123–24 (3d ed. 2005)); *Hicks*, 965 F.3d at 463.

Further, Tennessee regulations give guidance regarding the calculation of actual cash value, Tenn. Comp. R. & Regs. 0780-01-05-.09 (1) (2017), so State Farm's discretion is not

---

[12]The Rules Enabling Act provides that any rule of federal procedure cannot "abridge, enlarge, or modify any substantive right." 28 U.S.C. § 2072(b).

unlimited: it is the discretion to choose which method to apply.[13]  In other words, breach of the contract is still possible if Clippinger establishes that the challenged adjustments State Farm actually applied do not reflect fair market value or the cost of comparable automobiles, or if State Farm, having chosen a methodology, does not follow it fairly or in good faith.  *See Stuart v. State Farm Fire & Cas. Co.*, 910 F.3d 371, 376–77 (8th Cir. 2018);[14] *cf. Allen v. Middle Tenn. Sch. of Anesthesia, Inc.*, No. 3:20-cv-00903, 2022 WL 10551094, at *12 (M.D. Tenn. Oct. 18, 2022) (covenant of good faith and fair dealing is especially important where contracts "leave some room for discretion").  State Farm *has* chosen a methodology here, and it did so classwide.  *See Hicks*, 965 F.3d at 460–62 (rejecting similar argument).  That choice, the way it was implemented, and the resulting effect on the valuation of totaled cars are all challenged by Clippinger.  State Farm cannot escape potential liability for its chosen approach by claiming that it could have used another.

The dissent also argues that *Hicks* is distinguishable, because it "presented no valuation difficulties": withholding labor depreciation costs had been determined to be illegal, so removing them from the calculations was straightforward.  Dissent at 19–20.  On the contrary, State Farm in *Hicks* advanced plenty of valuation difficulties, many analogous to those advanced in this case.  *See, e.g.*, *Hicks*, 965 F.3d at 461 ("[W]e are not persuaded by State Farm's argument that its own potential overestimations show that individualized inquiries predominate").  True, as the dissent says, in *Hicks* the challenged labor depreciation had already been determined to be against Kentucky law in a previous Sixth Circuit decision.  *Hicks v. State Farm Fire & Cas. Co.*, 751 F. App'x 703, 711 (6th Cir. 2018).  But plaintiffs are attempting to establish something very similar in this case: that application of the TNA is both a breach of contract and against Tennessee regulations.  We still follow *Hicks*.  And we do not believe there is a reason that this

---

[13]The dissent emphasizes two of the three Tennessee regulatory requirements for a "source for determining statistically valid fair market values."  Dissent at 2–3; Tenn. Comp. R. & Regs. 0780-01-05-.09 (1)(b)(4)(i)–(ii).  It does not emphasize the third, which requires that such a permissible source actually "produce fair market values" based on current and local data "or a necessary expansion of parameters (such as time and area) to assure statistical validity."  *Id.* 1(b)(4)(iii).  To the extent State Farm's practice represents a choice of the (b)(4) methodology, as the dissent suggests, Clippinger's claims would seem to implicate this requirement at least.  Dissent at 3.

[14]Although in *Stuart* the parties agreed broadly on a valuation methodology, the applicability of the Tennessee regulations with their substantive requirements for an actual cash value payout means this case is closer to *Stuart* than it is to the situation in *In re State Farm Fire and Casualty Company*, 872 F.3d 567, 576 (8th Cir. 2017) in which State Farm had to come up only with a "reasonable" estimate.  *Stuart*, 910 F.3d at 376.

liability question must have been answered in a separate proceeding. *See Jama*, 113 F.4th at 933 (impermissibility under Washington law of negotiation adjustment established).

Ultimately, State Farm's predominance arguments are unsuccessful for similar reasons as are its typicality arguments. State Farm contends that the merits of a plaintiff's claim will rise or fall entirely with reference to an individualized actual cash value, and that State Farm has infinite discretion to choose its valuation method, reach a deal, then pick another at trial, in an endless bait and switch. As set forth above, we agree with the district court that the damages issues do not preclude certification on predominance grounds. Like the Ninth Circuit in *Jama*, we believe that the Audatex valuation without the TNA applied—which is State Farm's own calculation methodology—provides at the very least a "starting place" for classwide valuation and damages calculation. *Jama*, 113 F.4th at 936–37. And thus, State Farm's ability to argue individualized damages issues remains—but it would still be defending its actual practice in valuing cars and paying claims rather than hypothetical practice.

2.

We next address the district court's determination that class action is superior to other forms of litigation or resolution. Rule 23(b)(3) requires superiority, or a determination that "class litigation is a superior way to resolve the controversy." *Hicks*, 965 F.3d at 463. The district court held that class action was superior to individualized litigation. We conclude that the district court's reasoning on this point was not an abuse of discretion. Where a common course of conduct has injured a large number of plaintiffs, and where individual damages may be small, adjudication on the classwide scale can be "warranted particularly because class members are not likely to file individual actions—the cost of litigation would dwarf any potential recovery." *In re Whirlpool Corp.*, 722 F.3d at 861. The district court concluded that "the damages suffered" by the class members "are small when compared to the expense and burden of individual litigation." DE 202, Order on Class Cert., Page ID 6948. State Farm's argument against superiority hinges once again on appraisal—it claims that appraisal is quick, inexpensive, could not be adjudicated at the classwide level, and will reach the correct value for any party who disputes their valuation. But we are not convinced that class resolution, as opposed to individual appraisals, poses a problem. Decertifying on the basis that State Farm *may* choose to

invoke its right to appraisal with all 90,000 class members would be speculative and would be relevant only to damages and defenses; the district court can manage that issue, if it becomes one, as litigation continues. *See Hicks*, 965 F.3d at 462 ("The district court has the power to amend the class definition at any time before judgment.").

State Farm argues that, under *Speerly*, the district court improperly "defer[red]" this question beyond the certification stage, "kick[ing] the appraisal can down the road." CA6 R. 44, Rule 28(j) Letter (citing *Speerly*, 143 F.4th at 317). The district court did not abuse its discretion on this point. In certifying the class, following its earlier decision denying summary judgment to State Farm, the court noted that appraisal, if invoked, would "only change the nature of a class member's damages." DE 202, Order on Class Cert., Page ID 6944. The possibility of mass appraisal for this class remains speculative as a factual matter.[15] And individualized damages issues, even those that may have to be tried separately, do not necessarily defeat certification. *See Beattie*, 511 F.3d at 564.

3.

Finally, we analyze the district court's application of Rule 23's implicit "ascertainability" requirement. *See Sandusky Wellness Ctr., LLC v. ASD Specialty Healthcare, Inc.*, 863 F.3d 460, 471 (6th Cir. 2017). The district court agreed with Clippinger that, because all the facts required for class membership could be determined with reference to State Farm's own records, "the criteria for class membership for the State Farm class here is 'sufficiently definite' and is therefore ascertainable." DE 202, Order on Class Cert., Page ID 6939. State Farm does not contest ascertainability on appeal. We conclude that the district court did not abuse its discretion here. *See Young*, 693 F.3d at 539–40 (large number of internal insurance records to review did not render class membership too difficult to ascertain).

---

[15]We also note that in some circumstances, flexible class treatment can accommodate post-certification factual developments within the class without destroying typicality and predominance so long as the potential for factual changes is common throughout the class. *Cf. Uhl v. Thoroughbred Tech. and Telecomms.*, 309 F.3d 978, 985–86 (7th Cir. 2002) (certifying class containing two subclasses, which were in the same position at the time of certification, but which would eventually be differently affected depending on which side of a railroad track the defendant ultimately sought to place a fiber optic cable); *see also* Samuel Issacharoff & Richard A. Nagareda, *Class Settlements Under Attack*, 156 U. Penn. L. Rev. 1649, 1685–89 (2008) (discussing *Uhl*). Before appraisal is potentially invoked, Clippinger's proposed class is all still in the same position.

IV.

We affirm the district court's order certifying the class and remand for further proceedings.

———————————

**DISSENT**

———————————

MURPHY, Circuit Judge, dissenting.   Many cases from around the country have presented the same basic question: Suppose an insurer promises to pay the "actual cash value" of an insured's vehicle if the vehicle gets destroyed in an accident.  Suppose further that the insurer uses a general method to calculate actual cash value.  If car owners believe that this method includes an improper deduction, may they pursue a class action?  By my count, five circuit courts have now answered "no" because individual issues about the *unique value of each vehicle* will dominate all other questions.  *See Ambrosio v. Progressive Preferred Ins. Co.*, __ F.4th __, 2025 WL 2628179, at *4–5 (9th Cir. Sept. 12, 2025); *Freeman v. Progressive Direct Ins. Co.*, 149 F.4th 461, 468–71 (4th Cir. 2025); *Schroeder v. Progressive Paloverde Ins. Co.*, 146 F.4th 567, 576–78 (7th Cir. 2025); *Drummond v. Progressive Specialty Ins. Co.*, 142 F.4th 149, 158–61 (3d Cir. 2025); *Sampson v. United Servs. Auto. Ass'n*, 83 F.4th 414, 417, 421–23 (5th Cir. 2023).  My colleagues disagree with these circuits by certifying a class that should result in some 90,000 trials about the fair market value of each class member's car.  And to the extent that my colleagues can avoid that result, they may do so only by violating the insurer's "substantive right" to prove that it paid each class member an amount equal to the fair market value of that class member's car.  *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 367 (2011) (quoting 28 U.S.C. § 2072(b)).  I would not create this circuit split or certify this unwieldy class action.  So I respectfully dissent.

I

State Farm Mutual Automobile Insurance Company uses a standard-form insurance policy to insure the vehicles of its Tennessee customers.  The policy allows State Farm to pay for damaged cars in different ways.  As relevant now, State Farm may "[p]ay the actual cash value of the covered vehicle minus any applicable deductible[.]"  Policy, R.146-2, PageID 4018.  The policy does not define the key phrase: "actual cash value."  But it does identify the *process* that State Farm and an insured should use to calculate this value.  *Id.*, PageID 4018–19.  The policy first proposes that the parties negotiate to an agreement: "The owner of the covered vehicle and

we must agree upon the actual cash value of the covered vehicle." *Id.*, PageID 4018. If they cannot agree, the policy allows either side to seek an appraisal: "If there is disagreement as to the actual cash value of the covered vehicle, then the disagreement will be resolved by appraisal upon written request of the owner or us[.]" *Id.* The policy goes on to identify the "procedures" for this appraisal. *Id.* Each party gets to pick one appraiser, and the chosen appraisers then pick a third. *Id.* These three appraisers have the power to do just one thing: "determine the actual cash value" of the totaled car. *Id.*, PageID 4019. If two of them agree on this number in a "written appraisal" that includes an "explanation," that number will bind both sides. *Id.* Car owners must bear their own expenses for this appraisal process and split the cost of the third appraiser with State Farm. *Id.*

Separately, a Tennessee regulation identifies several methods that insurers may use to calculate the "actual cash value" of totaled vehicles. Tenn. Comp. R. & Regs. § 0780-01-05-.09(1). If an insurer pays a "cash settlement," it may base that settlement on the "actual cost" of a vehicle "comparable" to the totaled one. *Id.* § 0780-01-05-.09(1)(b). The regulation identifies optional ways to determine this cost. *Id.* The insurer may: (1) look to the "cost of two or more comparable automobiles in the local market"; (2) look to the "cost of two . . . or more comparable automobiles" in nearby markets; (3) ask two or more "licensed dealers" in the local market for "quotations" if the first two methods are unavailable; or (4) use a general "source for determining statistically valid fair market values[.]" *Id.* If an insurer takes the fourth path, the general source must (among other things) "give primary consideration to the values of vehicles in the local market" and contain a "database" that can estimate the value of 85% of all vehicles on the market for the last 15 years. *Id.* Lastly, an insurer may "deviate[]" from these identified methods if the insurer supports the "deviation" with "documentation giving particulars of the automobile condition" and if it "fully explain[s]" its approach to the car owner. *Id.* § 0780-01-05-.09(1)(c).

During the relevant time, State Farm followed the fourth approach to determine the actual cash values of destroyed vehicles. It relied on a large database of advertised or recently sold vehicles compiled by a company named "Audatex." When a customer called State Farm about a destroyed car, a State Farm estimator would collect basic information about the car's pre-

accident condition. The estimator would upload this information into Audatex's database and obtain an "Autosource Report" that proposed the fair market value of the totaled vehicle based on the prices of comparable vehicles in the area. If the database identified the "advertised prices" for these compared vehicles, the report would include a "typical negotiation" deduction. As the theory for this deduction, Audatex assumed that "most people" negotiate with used-car dealers to get a reduced *sale* price as compared to the *advertised* one. Graff Decl., R.146-1, PageID 3990. (An expert suggested that Audatex would not use this deduction if the database had the actual sale prices of the comparable vehicles or if a "no haggle" dealer advertised them. Lowell Decl., R.156, PageID 4950. But other evidence suggests that an Autosource Report sometimes used the adjustment even for no-haggle dealers. *See* Appellee's Br. 22.) Claims handlers would next review the report and make any adjustments they found appropriate. Once they approved the Autosource Report, they would talk with customers about the estimated value. If the parties reached an agreement, claims handlers would then document that agreement in the claim file.

State Farm's interaction with the named plaintiff (Jessica Clippinger) shows how this process worked. After Clippinger got into an accident, she contacted State Farm. State Farm obtained an Autosource Report for Clippinger's minivan. This report identified the advertised prices (ranging from $15,800 to $18,803) for four comparable vans in Tennessee. The report used the typical-negotiation adjustment to reduce those four prices by between $790 and $940. It next reduced the four prices even further to account for differences in mileage and features between the comparable vans and Clippinger's van. The report lastly averaged these reduced prices together to identify the actual cash value for Clippinger's van: $14,490. State Farm and Clippinger agreed on this amount. State Farm thus paid it to Clippinger and her lender.

About a year later, though, Clippinger brought this class-action suit against State Farm. She challenged just one aspect of State Farm's valuation process: its use of the typical-negotiation adjustment. She alleged that this adjustment breached the insurance policy and the implied duty of good faith and fair dealing. Why? According to Clippinger, State Farm's own data showed that—on average—used vehicles sell for their advertised prices without any negotiation reduction. Apart from this adjustment, though, Clippinger agreed that State Farm

conducted a "detailed, sound, and reliable appraisal" process.  Appellee's Br. 13.  So she argued that State Farm undervalued the actual cash value of its customers' vehicles by the precise size of this adjustment.

Once Clippinger sued, State Farm invoked the insurance policy's appraisal process.  The district court required her to use it.  The three appraisers did not initially agree on the valuation: State Farm's appraiser valued Clippinger's van at $14,432; Clippinger's appraiser valued it at $17,756.69, and the third appraiser valued it at $18,476.13.  But Clippinger's appraiser eventually came around to the third appraiser's number, so the two issued a written decision valuing the van at $18,476.  The parties were bound by this number under the insurance policy's terms, so State Farm paid Clippinger the difference between this higher valuation and its original one.

Even so, the district court held that this payment did not moot Clippinger's suit.  The court denied State Farm's motion seeking summary judgment on her individual claim.  It held that a reasonable jury could find that State Farm breached the policy (and the implied duty of good faith and fair dealing).  *See Clippinger v. State Farm Auto. Ins. Co.*, 630 F. Supp. 3d 947, 956, 958 (W.D. Tenn. 2022).  It added that a reasonable jury could find that this breach harmed Clippinger by forcing her to incur appraisal costs to obtain her actual cash value.  *Id.* at 957.

Clippinger next moved to certify a class against State Farm.  The district court granted this motion.  *See Clippinger v. State Farm Auto. Ins. Co.*, 2023 WL 7213796, at *15–16 (W.D. Tenn. Aug. 25, 2023).  The court accepted Clippinger's claimed "common" question: Did the typical-negotiation adjustment "artificially reduce[]" State Farm's actual-cash-value estimate because the adjustment did not "accurately reflect[] how cars are valued and sold in the" used-car market?  *Id.* at *11.  The court next rejected State Farm's claim that individual issues would predominate over this common question.  State Farm had argued that it could still show that it provided the "actual cash value" for every class member's vehicle using vehicle-specific evidence.  *Id.* at *12.  But the district court accepted Clippinger's competing claim that she could identify each class member's injury and damages using a simple mathematical calculation.  *See id.* at *12, *14.  According to Clippinger, if she convinced a jury that buyers rarely negotiate with sellers for reduced prices, the court could determine each class member's injury (and

damages) merely by recalculating the Autosource Report *without* the typical-negotiation adjustment. *See id.* The court agreed. *See id.* It thus certified a class of State Farm customers whose payment for a totaled vehicle had rested on an Autosource Report that "decreased" the estimated "actual cash value" "based upon typical negotiation adjustments" for comparable vehicles. *Id.* at \*16.

## II

My colleagues hold that every class member has Article III standing to pursue these claims and that the district court properly certified a class action. I agree that Clippinger had standing when she sued and that the post-complaint appraisal process for her van did not moot her claim. But I would not decide any broader questions about the standing of absent class members. Their standing becomes relevant only if we find that the district court properly certified a class action. *See Fox v. Saginaw County*, 67 F.4th 284, 296 (6th Cir. 2023). And I would hold that the court wrongly certified the class on other grounds. *See Speerly v. Gen. Motors, LLC*, 143 F.4th 306, 315 (6th Cir. 2025) (en banc).

Plaintiffs who seek to certify a class action must satisfy the well-known requirements in Federal Rule of Civil Procedure 23. They must establish the "numerosity, commonality, typicality, and adequate representation" requirements in Rule 23(a). *See Wal-Mart*, 564 U.S. at 349. They must then fit their case into one of the class-action types in Rule 23(b). *See id.* at 360–63. For a class action under Rule 23(b)(3), plaintiffs must show (among other things) that "questions of law or fact common to class members predominate over any questions affecting only individual members[.]" Fed. R. Civ. P. 23(b)(3); *Speerly*, 143 F.4th at 316.

Applying these rules here, I agree that the proposed class action includes at least one common question. But any common questions pale in comparison to the individual issue that will drive this litigation: what was the actual cash value of each class member's vehicle?

### A. Commonality

Start with Rule 23(a)'s commonality element. To qualify as a common question, the question must satisfy two requirements. First, a jury must be able to answer the question in the

same way—either "yes" or "no"—for every class member. *See Wal-Mart*, 564 U.S. at 350. If a jury could resolve the question for some class members and against others, it does not qualify as a "common" one. *See Doster v. Kendall*, 54 F.4th 398, 431 (6th Cir. 2022), *vacated as moot*, 144 S. Ct. 481 (2023). Second, the question must be "central to the validity" of all the class members' claims. *Wal-Mart*, 564 U.S. at 350. It thus will typically resolve (or go a long way to resolving) an element of the class's common claims. *See Speerly*, 143 F.4th at 316–17, 319.

Has Clippinger satisfied these benchmarks? To answer that question, we must first identify the claims she wants to litigate for the class. *See id.* at 316–17. She seeks to pursue claims for breach of contract and breach of the implied duty of good faith and fair dealing under Tennessee law. But the latter claim is not a standalone cause of action in Tennessee. *See Davidson v. Arlington Cmty. Schs. Bd. of Educ.*, 847 F. App'x 304, 310 (6th Cir. 2021) (quoting *Shah v. Racetrac Petroleum Co.*, 338 F.3d 557, 572 (6th Cir. 2003)); *Cadence Bank, N.A. v. The Alpha Tr.*, 473 S.W.3d 756, 773 (Tenn. Ct. App. 2015). So the class must prove the elements of a breach-of-contract claim: that an enforceable contract existed; that State Farm's conduct qualifies as a breach of the contract; and that this breach caused damages. *See Fed. Ins. Co. v. Winters*, 354 S.W.3d 287, 291 (Tenn. 2011); *C & W Asset Acquisition, LLC v. Oggs*, 230 S.W.3d 671, 676–77 (Tenn. Ct. App. 2007).

When evaluating this case's record, I see at least one common question about the first breach-of-contract element: Did State Farm enter a binding contract with members of the class? A jury could resolve this question in the same "yes" or "no" way for all class members because Clippinger has shown that State Farm used a standard-form policy. *See Wal-Mart*, 564 U.S. at 350. This uniform policy represents a binding contract for all class members or for none. This question also is "central to the validity" of the claims. *Wal-Mart*, 564 U.S. at 350. No breach-of-contract claim can exist without a contract. *See Fed. Ins.*, 354 S.W.3d at 291. To be sure, I suspect that State Farm would not even dispute this element. But the question's undisputed nature would not make it any less common. *See Hicks v. State Farm Fire & Cas. Co.*, 965 F.3d 452, 458–59 (6th Cir. 2020); *see also Doster*, 54 F.4th at 432. And a plaintiff must identify just *one* common question to satisfy Rule 23(a). *See Wal-Mart*, 564 U.S. at 359.

That said, the district court did not rely on the first breach-of-contract element to find a common question.  It instead quoted from Clippinger's brief to identify the following "central question": "[W]hether application of the [typical-negotiation adjustment] means . . . [that State Farm and Audatex] are not calculating [actual cash value] as contractually required but are, instead, calculating an artificially reduced amount."  *Clippinger*, 2023 WL 7213796, at *11.  I find this question difficult to decipher.  Later in the same paragraph, though, the court rephrased the question in a way that clarifies what it found to be the common issue: "whether the [typical-negotiation adjustment] accurately reflects how cars are valued and sold in the market."  *Id.*

The district court thus identified the "common" question as one about the *general* state of the used-car market: Do *advertised* prices (rather than *sale* prices) represent the fair market value of used cars such that State Farm's typical-negotiation adjustment systematically understates that value?  For what it is worth, other plaintiffs in similar insurance cases have tried to rely on similar market-condition questions.  In one case, the plaintiffs identified the common question as whether "list prices" (that is, advertised prices) represent the "market value" for used cars.  *Schroeder*, 146 F.4th at 576.  In another, the plaintiffs identified the common question as whether a "projected sold adjustment" (another name for the typical-negotiation adjustment) was "legitimate" given the market realities.  *See Drummond*, 142 F.4th at 153, 157.

Does this question about the general conditions of the used-car market meet the two commonality requirements in Rule 23(a)?  I will take them in turn.

*Requirement One*: Can a jury answer the market-condition question in the same way for the entire class?  *See Wal-Mart*, 564 U.S. at 350.  Yes.  Like the Seventh Circuit, I agree that the question has a "yes" or "no" for every class member.  *See Schroeder*, 146 F.4th at 576.  To explain why, I must return to the justification for the typical-negotiation adjustment.  Audatex's database usually contains *advertised* prices for vehicles that resemble an insured's totaled vehicle; it seldom contains the prices for which these comparable vehicles *sold*.  Yet if a buyer of one of the comparable vehicles negotiated the advertised price down by 5%, this lower sold price—not the higher advertised price—would represent the "fair market value[]" of that comparable vehicle: "the price a willing buyer would pay a willing seller" in a voluntary market.  Tenn. Comp. R. & Regs. § 0780-01-05-.09(1)(b) ¶ 4; *Lammert v. Auto-Owners (Mut.) Ins. Co.*,

572 S.W.3d 170, 174 (Tenn. 2019) (citation omitted). This hypothetical fact pattern thus raises a few general questions about the used-car market: How often do buyers negotiate discounts to advertised prices? And what is the average size of any negotiated discount?

The parties answer these questions differently. According to State Farm, Audatex has reviewed "millions of transactions over time" and found "that used vehicles are typically sold for less than the advertised asking price." Lowell Decl., R.156, PageID 4949. State Farm believes it would "artificially inflate the" fair market value of its customers' totaled cars if it relied only on the advertised price of comparable vehicles. *Id.*, PageID 4950. To account for negotiations, Audatex reduces the advertised price for comparable vehicles by a percentage (which varies based on the specifically advertised amount). *Id.*, PageID 4950, 4955, 4957. Audatex also regularly adjusts the size of these percent reductions by "comparing the advertised asking prices of a statistically significant sample of vehicles to their actual sales prices[.]" *Id.*, PageID 4954.

According to Clippinger, by contrast, used-car dealers stopped advertising above-market prices over a decade ago when consumers obtained the ability to comparison shop on the internet. Felix Rep., R.139-14, PageID 3074. Her expert thus opined that the typical-negotiation adjustment "is directly contrary to reality in the used auto market" today. *Id.*, PageID 3075. Although dealers sometimes sell cars below their advertised price, they do so typically for reasons unrelated to the car's value (for example, because the buyer had a trade-in or used dealer financing). *Id.*, PageID 3076–77. Even worse, Clippinger asserts that Audatex calculates the percentage for its typical-negotiation adjustment based on biased statistics that exclude cars that sell at or above their advertised prices. Merritt Decl., R.140-14, PageID 3817. Clippinger thus argues that the percentage that State Farm uses arbitrarily inflates any real-world average discount. *See id.*

No matter who is right in this debate, the answer to this question about the general market will not vary from class member to class member. Indeed, the *average* price reduction from negotiations will remain the same for every class member almost by definition. That is the point of an average. Clippinger and State Farm also can use "common evidence"—such as "expert testimony" or "empirical data"—to answer the question. *Schroeder*, 146 F.4th at 576.

*Requirement Two*: Is this question also "central to the validity" of every class member's contract claim? *Wal-Mart*, 564 U.S. at 350. I am less convinced on this front. Recall that a common question must *resolve*—or at least *affect*—an element of the class claim. *See Speerly*, 143 F.4th at 316–17, 319. Here, then, we must pinpoint the contract element implicated by this market-condition question. The district court held that the jury's answer to the question would conclusively *decide* the second contract element for every class member because it would show that State Farm's use of the typical-negotiation adjustment *breached* the insurance policy. *See Clippinger*, 2023 WL 7213796, at *8, *11; *see also Fed. Ins.*, 354 S.W.3d at 291.

The district court was mistaken. In fact, the court relied on the same "erroneous framing" that several other circuit courts have corrected in identical circumstances. *Drummond*, 142 F.4th at 156; *Sampson*, 83 F.4th at 422; *see also Ambrosio*, 2025 WL 2628179, at *4; *Freeman*, 149 F.4th at 468–69; *Schroeder*, 146 F.4th at 576–78. To decide whether this market-condition question will conclusively prove a "breach" of contract for every class member, we must, of course, evaluate what the insurance policy required. *See Ambrosio*, 2025 WL 2628179, at *4; *Schroeder*, 146 F.4th at 576–77; *Drummond*, 142 F.4th at 156. Although this analysis compels us to examine the "merits" of the contract claim to decide the claim's propriety for class treatment, that result "cannot be helped." *Wal-Mart*, 564 U.S. at 351.

What did State Farm promise in the policy? Like the policies in these other circuit cases, State Farm promised to pay the "actual cash value" of each class member's totaled vehicle. Policy, R.146-2, PageID 4018; *cf. Freeman*, 149 F.4th at 468; *Schroeder*, 146 F.4th at 576–78. And like the law in these other cases, Tennessee law interprets that phrase to mean fair market value (the price that a willing buyer would pay a willing seller). *See* Tenn. Comp. R. & Regs. § 0780-01-05-.09(1)(b) ¶ 4; *Lammert*, 572 S.W.3d at 174; *cf. Freeman*, 149 F.4th at 468; *Schroeder*, 146 F.4th at 576. Because fair market value often can be open to debate, the policy also identifies how the parties will determine this value: either negotiate to an *agreement* or submit to an *appraisal*. Policy, R.146-2, PageID 4018–19. In short, one will search in vain for a provision that barred State Farm from using typical-negotiation adjustments when it opened its negotiations with customers over the value of their totaled vehicles.

This fact creates a problem for Clippinger's efforts to certify a class. "The truth or falsity of whether cars sell for their [advertised] prices" as a *general* matter "will not resolve whether" State Farm's use of a typical-negotiation adjustment "breached [its] duty" to pay actual cash value to any *specific* class member. *Schroeder*, 146 F.4th at 576. If a specific class member still received an amount equal to fair market value even with the use of the typical-negotiation adjustment, the class member would have gotten what State Farm promised: the actual cash value. *See id.* Suppose, for example, that State Farm convinced a jury that the Audatex Autosource Report *overvalued* a specific class member's vehicle by introducing other valuation evidence (say, the Kelly Blue Book valuation or the valuation from an expert appraiser). Or suppose that State Farm tracked down the sale prices for the comparable vehicles identified in another class member's Autosource Report and found that the buyers negotiated *actual* sale prices below the sale prices *estimated* using the typical-negotiation adjustment. Or consider Clippinger's own case. Suppose that a jury believed the State Farm appraiser's view that her van was worth $14,432—*below* the amount listed in her Autosource Report ($14,490). In each circumstance, these class members would have received what State Farm promised (actual cash value) even if the typical-negotiation adjustment were bunk as a general matter. *See Ambrosio*, 2025 WL 2628179, at *4–5; *Freeman*, 149 F.4th at 468–69; *Schroeder*, 146 F.4th at 576–77; *Drummond*, 142 F.4th at 156–57. In short, the district court seemed to concede "that even class members who were paid above [actual cash value]—despite use of [the typical-negotiation adjustment]—would still have a breach-of-contract claim against [State Farm]." *Drummond*, 142 F.4th at 157; *see Clippinger*, 2023 WL 7213796, at *11. As other courts have recognized, that surprising conclusion is wrong. *Drummond*, 142 F.4th at 157.

At best, the answer to this market-condition question might provide "relevant evidence" that class members would all find useful in proving their breach claims. *Lara v. First Nat'l Ins. Co. of Am.*, 25 F.4th 1134, 1140 (9th Cir. 2022). That is, if State Farm applied an improper adjustment as a general matter, this common evidence might *support* (even if it did not *establish*) a specific class member's claim that State Farm paid less than actual cash value in a specific case. This market-condition question thus might "resolve[] a central issue short of the breach issue" and so satisfy Rule 23(a)'s commonality requirements. *Schroeder*, 146 F.4th at 577. At day's end, I am content to assume as much. *Id.*

## B. Predominance

But that fact does not end matters. Like the other circuit courts, I would instead hold that Clippinger has not met Rule 23(b)(3)'s "more exacting" predominance requirement. *Drummond*, 142 F.4th 161. This requirement tells a court to weed out all the common issues (those that a jury can decide for the entire class) from all the individual issues (those that will require a class-member-by-class-member decision). *See Fox*, 67 F.4th at 300; *see also Drummond*, 142 F.4th at 158–59. The court must then determine which side will "predominate" over the other during the litigation. *See Fox*, 67 F.4th at 300; *see also Schroeder*, 146 F.4th at 574.

I have already identified the questions that I will assume are on the common side of this line: Did a valid contract exist? And did State Farm's typical-negotiation adjustment "accurately reflect[] how cars are valued" in the used-car market? *Clippinger*, 2023 WL 7213796, at *11. I will also assume that Clippinger could persuade a jury to accept her answers to these questions.

Yet that assumption would not go far enough to make class litigation worthwhile. Why? Because a question on the individual side of the line "likely will dominate" all others: what was the "actual cash value" of each class member's totaled vehicle? *Tarrify Props., LLC v. Cuyahoga County*, 37 F.4th 1101, 1106 (6th Cir. 2022). A jury would have to identify this fair market value *for each class member* before it could resolve the primary two elements of that class member's breach-of-contract claim at issue in this litigation: whether State Farm *breached* the policy and what the class member's *damages* were from that alleged breach. *See Lara*, 25 F.4th at 1139–40. This valuation inquiry will require a fact-intensive review of each class member's car. Indeed, what we have said for homes remains true for cars: "[d]etermining fair market value requires an independent and individualized assessment of each absent class member's property." *Tarrify Props.*, 37 F.4th at 1106. Countless factors affect the fair market value of a used car, including "the year, make and model, mileage, options, and the overall condition of the vehicle immediately before the" accident. Bent Appraisal, R.146-20, PageID 4287.

But the reader need not take my word for it. Consider what the parties went through to identify the fair market value of just one class member's vehicle: Clippinger's van. Three

appraisers came up with three different values for this van—two above what State Farm had paid and one below that amount.  State Farm's appraiser determined the actual cash value by using "prices in actual sale transactions" for four comparison vans.  O'Rourke Appraisal, R.146-19, PageID 4187.  The appraiser called local dealerships to confirm the sale prices.  *Id.*, PageID 4190–92.  And the appraiser closely compared Clippinger's car to the other minivans.  *Id.*  In contrast, Clippinger's appraiser looked to "nationally recognized valuation guides" and communicated with "local dealers and private sellers."  Bent Appraisal, R.146-20, PageID 4288. He also relied on the sale prices of comparable vans.  *Id.*, PageID 4287.  The third appraiser provided excruciating detail about all aspects of Clippinger's van and the comparator vans— down to the jack inputs for cellphones and rear cupholders.  Chandler Appraisal, R.146-21, PageID 4296–304.

Now consider what this fact-intensive inquiry will entail for the class.  There are over 90,000 absent class members.  The jury will have to rely on similar car-specific evidence for each class member to determine the value of that member's car.  The jury will then have to compare the fair market value that it estimates to the amount that State Farm paid the class member.  So class counsel and State Farm will have "to bring in necessarily individual proof, plaintiff-by-plaintiff, to determine which were undercompensated."  *Drummond*, 142 F.4th at 159–60.  Not only that, State Farm has the contractual right to invoke the same "appraisal" process used to value Clippinger's van for every class member.  Policy, R.146-2, PageID 4018. This appraisal provision makes this suit even more ill-suited for class treatment.  *Cf. Speerly*, 143 F.4th at 335.

Many other circuit courts have reached the same conclusion.  Take the Ninth Circuit's recent decision in *Ambrosio*.  There, an insured challenged Progressive's "projected sold adjustment" that reduced the advertised prices for comparable vehicles to "reflect consumer purchasing behavior" like "negotiating a different price than the listed price[.]"  2025 WL 2628179, at *2.  The district court refused to certify a class of Arizona car owners who had been subjected to this adjustment because individual questions about the adjustment predominated. *Id.*  The Ninth Circuit affirmed.  *Id.* at *5.  The court reasoned that the question whether Progressive's use of the adjustment breached its contract with an insured "would involve an

inquiry specific to that person." *Id.* (quoting *Lara*, 25 F.4th at 1139). And that fact-specific inquiry was just the sort of "aggregation-defeating, individual issue[]" that precluded class certification. *Id.* (citation omitted). Or consider the Fourth Circuit's conclusion in *Freeman*. There, car owners in South Carolina likewise challenged Progressive's projected sold adjustment. 149 F.4th at 465. In reversing the district court's class-certification order, the Fourth Circuit explained that the process of proving that Progressive paid less than actual cash value was "totally individualized" and thus "preclude[d] class certification." *Id.* at 471. The Seventh Circuit, in a case remarkably similar to *Freeman*, reached the same result. *Schroeder*, 146 F.4th at 577. And the Third Circuit likewise found that individual issues predominated over common ones when it reversed a district court's decision to certify a class of Pennsylvania car owners subject to the same adjustment. *Drummond*, 142 F.4th at 158–61.

To be sure, the district court at least recognized the problem that the parties would have to rely on individual evidence to determine the fair market value of each totaled car. But the court thought it found a fix by accepting Clippinger's valuation model. According to Clippinger, the class did not object to any part of the Autosource Reports *other than* the typical-negotiation adjustment. *See Clippinger*, 2023 WL 7213796, at *11. So Clippinger wanted to use a simple model to determine each class member's injury and damages: recalculate "every step of State Farm's methodology" that led to those reports "except" the typical-negotiation adjustment. *Id.* at *12. The district court agreed with this approach, reasoning that State Farm could not dispute that its Autosource Reports accurately estimated actual cash value because State Farm had used those reports to determine the value of its customers' cars. *See id.* In short, the district court seemed to *categorically bar* State Farm from introducing other evidence—other valuation sources, other expert appraisers, other comparable vehicles, or the like—to try to convince a jury that the amount it paid to each class member equaled the actual cash value of that class member's car.

This approach does avoid the individual-evidence problem that should have derailed this class action. By doing so, though, the district court ran headlong into a much bigger problem: it violated the law by disregarding State Farm's substantive rights. Congress may have allowed the Supreme Court to create the "adventuresome innovation" that is a Rule 23(b)(3) class action, but

the legislature also put important guardrails in place. *Wal-Mart*, 564 U.S. at 362 (quoting *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 614 (1997)). Among the guardrails, this rule may "not abridge, enlarge or modify any substantive right" of a party. 28 U.S.C. § 2072(b); *see Wal-Mart*, 564 U.S. at 367. So we must interpret Rule 23 in a way that respects the parties' rights. *See Amchem*, 521 U.S. at 613; *see Ortiz v. Fibreboard Corp.*, 527 U.S. 815, 845 (1999).

The district court failed to heed this command. If a single class member had sued State Farm in an individual suit, Tennessee law would have given State Farm "discretion" to use a wide array of evidence apart from the Autosource Report to show that it paid this class member the fair market value of the totaled vehicle. *See* Tenn. Comp. R. & Regs. § 0780-01-05-.09(1). At the least, the insurance policy would have given State Farm the right to prove this fact using expert appraisers. *See* Policy, R.146-2, PageID 4018–19. Yet the district court thought it could jettison these substantive rights by replacing the claim-by-claim litigation that they necessitate "with Trial by Formula." *Wal-Mart*, 564 U.S. at 367. The Supreme Court has already rejected this approach: "a class cannot be certified on the premise that [the defendant] will not be entitled to litigate its statutory defenses to individual claims." *Id.* I would have followed its clear instructions.

The Fifth Circuit has recognized the same thing in a similar case. *See Sampson*, 83 F.4th at 421–22; *see also Bourque v. State Farm Mut. Auto. Ins. Co.*, 89 F.4th 525, 527–29 (5th Cir. 2023). The *Sampson* plaintiffs argued that an insurer's method for determining the actual cash value of totaled vehicles violated a Louisiana regulation that listed the only approved methods. 83 F.4th at 417. The district court certified a class action made up of customers for whom the insurer had used the prohibited method. *See id.* But the Fifth Circuit reversed because each class member's claim would require individual proof about each vehicle's value. *See id.* at 422–23. To try to sidestep this problem, the plaintiffs had argued that they could prove damages on a class-wide basis by comparing the amounts they received under the forbidden method to the amounts that they would have received under one of the acceptable methods. *See id.* at 419. But the Fifth Circuit held that their attempt to limit the trial to just *one* acceptable valuation method was an "arbitrary choice" because the insurer had the "due process right" to rely on *any* of the acceptable methods to prove that it had paid each class member the actual cash value. *Id.*

at 420, 422. The district court in this case committed the same mistake as the district court in *Sampson*. Its desire to certify a class led it to arbitrarily limit the evidence that the parties may use to show actual cash value. In fact, the Fifth Circuit has since extended this logic to decertify another class action that challenged State Farm's use of the Autosource Reports at issue here. *See Borque*, 89 F.4th at 527–29.

Unlike the district court, I also see no legal reason why State Farm's earlier use of the Autosource Reports to reach informal agreements with customers should later bind it in litigation when customers *disagree* over the amounts in those reports. Nothing in the insurance policy dictated that result: it told the parties to identify actual cash value through agreement or appraisal. Perhaps the policy could bind State Farm to the reports if both sides had agreed that it represented the actual cash value in a specific case. But State Farm no more agreed that the reports provided an accurate assessment *without* the typical-negotiation adjustment than the class members agreed that it provided an accurate assessment *with* that adjustment. I would not allow class members to adopt an à la carte approach to valuation by taking what they want from the reports and discarding the rest. Either they must accept the value in the reports or start from scratch in litigation.

In response to this violation-of-substantive-rights concern, my colleagues *depart* from the district court's certification order. They agree that a class certification cannot violate a party's substantive rights and thus that State Farm would have the state-law right to present "individualized valuation evidence" to determine the actual cash value of each class member's vehicle. But their forthright concession takes us right back to the main problem with this class certification: that individual issues will predominate for each of the 90,000 class members' claims. Without its rights-violating shortcut, the district court will now have to spend decades overseeing nothing but individualized trials about the fair market value of insured cars. I doubt the court thought it was signing up for this impossible task when it certified the class.

This case also differs from the lone circuit decision in this context that might support the district court's class certification: *Jama v. State Farm Mutual Automobile Ins. Co.*, 113 F.4th 924 (9th Cir. 2024). In *Jama*, the court considered two adjustments that an insurer had used to reduce the advertised prices of comparable vehicles: a negotiation adjustment (like the one in this

case) and a condition adjustment (like the one in the earlier *Lara* case). *Id.* at 927. The court followed *Lara* when refusing to certify a condition-adjustment class. *Id.* at 935–36. (*Lara* concerned a "condition" adjustment that reduced the advertised prices for comparable vehicles based on the assumption that used-car dealers sell cars in better condition than the average car on the road. 25 F.4th at 1137. The *Lara* court affirmed the district court's denial of class certification, reasoning that individual valuation issues about each class member's car would matter much more than the general validity of the challenged adjustment. *Id.* at 1139–40.) Yet the *Jama* court distinguished *Lara* when certifying a negotiation-adjustment class. 113 F.4th at 931–35. The court reasoned that a Washington regulation *affirmatively prohibited* the negotiation adjustment, so it calculated the class members' damages as the difference between what they should have been paid without this illegal adjustment and what they were paid with it. *See id.* at 935. As the Ninth Circuit recently confirmed, though, the Tennessee regulation in this case is like the one in *Lara*—not *Jama*. *See Ambrosio*, 2025 WL 2628179, at \*4. That is, nothing in the regulation affirmatively bars State Farm from using a typical-negotiation adjustment. *See id.* Like the adjustments in *Ambrosio* and *Lara*, this adjustment violates the regulation only if it results in a payment *below the actual cash value* of a class member's car. But that determination will require a vehicle-by-vehicle evaluation.

A similar distinction also shows why my colleagues may not resort to our own decision in *Hicks*. That case concerned homeowner's (not car) insurance. *See Hicks*, 965 F.3d at 455. For damages to a house, State Farm promised to pay homeowners the replacement costs minus depreciation. *See id.* State Farm had been including labor costs within the depreciation reduction in violation of Kentucky law. *See id.* at 455–56. We upheld the certification of a class of homeowners that State Farm had illegally charged these labor costs. *Id.* at 466. Critically, *Hicks* presented no valuation difficulties because a court could determine the amount of money owed each class member based on the illegal amount of labor costs withheld. *See id.* at 460. State Farm had disagreed with this simple valuation, claiming the right to argue that it had miscalculated other parts of the amounts owed individual class members in ways that could offset the illegally withheld labor-cost amounts. *Id.* We disagreed because *Kentucky law* would treat this miscalculation as "an error in the insured's favor" that State Farm could not claw back. *Id.* at 461 (citation omitted). Here, by contrast, Clippinger points to no Tennessee law that bars

State Farm from taking a fresh approach to valuation when the question reaches litigation. So my colleagues are infringing on State Farm's "substantive rights" under Tennessee law in a way that we studiously avoided in *Hicks*. *Wal-Mart*, 564 U.S. at 367 (quoting 28 U.S.C. § 2072(b)).

\* \* \*

All told, my colleagues can certify a class action only by departing from the reasoning of many other circuit courts. And the resulting class action will either generate a never-ending valuation trial or deprive State Farm of its rights. I would not take this approach. I would instead follow our sister circuits by reversing the class certification. So I respectfully dissent.